## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **BRADLEY G. MARLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv1140 TCM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Bradley G. Marler's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the Court for a final disposition pursuant to the written consent of the parties. <u>See</u> 28 U.S.C. § 636(c). Mr. Marler has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## <u>Procedural History</u>

Plaintiff applied for DIB and SSI in March 2007, alleging that he was disabled as of December 23, 2005, because of a hip replacement, shoulder pain, knee and back problems,

depression, and stress. (R.[1] at 95-98, 101-03.) The alleged onset date was later amended to June 6, 2008. (Id. at 109.) His applications were denied initially and after a hearing held in March 2009 before Administrative Law Judge ("ALJ") Jhane Pappenfus. (Id. at 10-51, 58-63.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that he lives with his wife and two children, a son who is eighteen years old and a daughter who is eight. (Id. at 25.) He has a twelfth grade education and vocational training in welding and small engine repair. (Id. at 26.)

He has been in jail approximately six times, but never in prison. (Id. at 27, 28.) The last time he was in jail was in 1994. (Id. at 28.) The charges were either driving while intoxicated (DWI) or driving under the influence (DUI). (Id.) Asked when he last was drinking, he replied that he had had a couple of drinks the day before the hearing. (Id.) He had been in an altercation in 2006 with his son. (Id. at 27.) He smokes at most a pack of cigarettes a week, and has done so since he was sixteen. (Id. at 28-29.) The reference in his medical records to a pack a day is incorrect. (Id. at 28.)

The amended onset date of June 2008 was when Plaintiff last worked. (Id. at 29.)

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

The impairments that prevent Plaintiff from working include problems with his shoulders.  (<u>Id.</u> at 30.)  His right shoulder has been operated on twice and his left once.  (<u>Id.</u>)  He will soon have another operation on his left shoulder.  (<u>Id.</u>)  He can raise his left arm no farther than approximately half way up his body without experiencing pain and pulling.  (<u>Id.</u> at 30-31.)  He had had a cortisone shot the previous Friday in his left rotator cuff.  (<u>Id.</u> at 31.)  He also has pain in his left elbow and has had carpal tunnel surgery on both wrists.  (<u>Id.</u>)  He has problems with numbness in both hands.  (<u>Id.</u> at 32.)  On a scale from one to ten, with ten requiring that he go to the hospital, the pain on his left side is a constant eight.  (<u>Id.</u> at 33-34.)

Plaintiff will have to have surgery on his right knee.  (<u>Id.</u> at 35.)  He will have the surgery after his left shoulder problem is addressed.  (<u>Id.</u> at 36.)

Plaintiff can stand no longer than three to five minutes.  (<u>Id.</u>)  His knee starts hurting as soon as he gets out of bed.  (<u>Id.</u>)  He can only walk approximately 100 yards before having to stop.  (<u>Id.</u> at 37.)  His left leg has a steel rod and pins; his right knee has three screws.  (<u>Id.</u>)  The pain in his left hip is worse when he sits.  (<u>Id.</u> at 38.)  He can sit for no longer than five minutes before having to move around.  (<u>Id.</u>)  His sleep is poor.  (<u>Id.</u>)  His doctor recently gave him some medication to relieve the itching that is interfering with his sleep.  (<u>Id.</u> at 39.)  The itching is a result of hives; the hives are caused by stress.  (<u>Id.</u>)  The doctor thinks he might be allergic to something.  (<u>Id.</u> at 41.)  He has no side effects from the pain medication he is on.  (<u>Id.</u> at 40.)  He only takes pain medication when he has had an operation or has been hurt.  (<u>Id.</u> at 41.)  The time he took a friend's medication was when he had none.  (<u>Id.</u>)  He has also bought pain medication from people on the streets when he was hurting and had no

insurance. (<u>Id.</u>) His doctor does not know that he is drinking when taking pain medication. (<u>Id.</u> at 42.)

Asked what pain is worse during the day, Plaintiff explained that it depended on what he was doing. (<u>Id.</u> at 40.) For instance, if he pulls the door handle with his left hand, the pain in his left shoulder is excruciating. (<u>Id.</u>) If he takes a wrong step, the pain in his right knee is terrible. (<u>Id.</u>)

Asked about his daily activities, Plaintiff testified that he does not drive because he does not have a license. (<u>Id.</u> at 42.) He does not have a license because of the DWIs and DUIs. (<u>Id.</u> at 43.) Even if he had a license, it would be physically hard for him to drive. (<u>Id.</u> at 42.) He tries to pick up around the house. (<u>Id.</u> at 43.) He is "not allowed to touch the laundry." (<u>Id.</u>) He can prepare meals that can be microwaved, but cannot make a meal from recipes. (<u>Id.</u>) On a typical day, he sits and watches television. (<u>Id.</u> at 44.) He does not go anywhere. (<u>Id.</u>) His wife works three jobs and goes to school. (<u>Id.</u>) He likes to bow hunt and fish, but can now do neither. (<u>Id.</u>) He can take care of his personal needs. (<u>Id.</u>) He leaves the house to check the mail. (<u>Id.</u> at 45.)

Asked about the reference in his medical records to him drinking every day, Plaintiff explained that he no longer did because his wife would not allow it. (<u>Id.</u>) Also, he stopped drinking every day when he lost his job and could no longer afford it. (<u>Id.</u> at 46-47.)

Asked by the ALJ if Plaintiff was alleging a mental impairment, his counsel replied that he was not. (<u>Id.</u> at 40.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from various health care providers, and the reports of examining and non-examining consultants.

When applying for DIB[2] and SSI, Plaintiff completed a Function Report. (Id. at 134-41.) He explained that he tries to do daily chores, e.g., picking up around the house, cooking, running his younger child's bath water, or feeding the dogs. (Id. at 134, 135.) Sometimes he is successful and sometimes not because of his pain. (Id. at 134.) His wife then has to finish them. (Id.) He watches a lot of television. (Id.) Sometimes friends visit or take him to their house for a visit. (Id. at 134, 138.) He drinks beer and takes ibuprofen to help ease his pain. (Id. at 134.) He used to, but no longer can, hunt, fish, swim, boat, and throw a football with his son. (Id. at 135.) He does not sleep well; he tosses and turns all night. (Id.) It is hard for him to get his shirts on over his head, to wash his hair, and, sometimes, to get on and off the toilet. (Id.) The meals he can prepare consists of sandwiches and leftovers. (Id. at 136.) He used to do all the cooking. (Id.) He tries to pick up around the house, do the dishes, and mow the lawn using a riding mower. (Id.) To do these things, he needs reminding by "lots of yelling." (Id.) He goes outside four times a week. (Id. at 137.) His impairments affect his ability to lift, sit, climb stairs, squat, kneel, bend, use his hands, reach, complete tasks, walk, and get along with others. (Id. at 139.) He follows written and spoken instructions okay, gets

---

[2]Plaintiff previously applied for DIB, but did not pursue it after it was initially denied in November 1994. (Id. at 112.)

along with authority figures, and can pay attention for a long time.  (Id. at 139-40.)  He does

not handle stress well.  (Id. at 140.)  Instead, he gets grouchy, drinks, and yells.  (Id.)

A Function Report was also completed in Plaintiff's behalf by his wife.  (Id. at 117-25.)

She has known Plaintiff for twelve years and eight months.  (Id. at 117.)  Asked to describe

what he does during the day, she responded that he complains about his shoulders, hip, and

knee.  (Id.)  He tries to help her with light household chores.  (Id.)  Sometimes he cooks,

cleans, and helps their children with homework.  (Id. at 118.)  Before his impairments,

Plaintiff swam, fished, hunted, hiked, played football with their children, boated, went to

races, and worked hard.  (Id. at 118, 121.)  Now, he complains, becomes depressed, and

drinks a lot of beer.  (Id. at 118.)  He can not get comfortable to sleep well and tosses and

turns all night.  (Id.)  He has problems getting shirts on and over his head.  (Id.)  It is painful

for him to wash his hair.  (Id.)  He cooks simple meals, prepares sandwiches, and warms

frozen dinners.  (Id. at 119.)  He helps with the household chores by picking up toys off the

floor, doing the dishes, sweeping the floor, and using the riding mower.  (Id.)  The length of

time it takes for him to do these things varies from a few minutes to hours, depending on how

he is feeling.  (Id.)  He will do the inside chores once a week; he mows the lawn once or twice

a year.  (Id.)  Plaintiff goes outside two or three times a week.  (Id. at 120.)  He visits friends

with her.  (Id. at 121.)  Sometimes, his drinking causes friction with his family and friends.

(Id.)  Currently, because of his pain and his dislike of pills, he does not want to do much of

anything except drink beer.  (Id. at 122.)  She concurred with Plaintiff about which abilities

are affected by his impairments with two exceptions.  (Id.)  She included standing as an

impairment that is adversely affected, but did not include getting along with others. (Id.) She reported that Plaintiff follows written and spoken instructions well and gets along with authority figures. (Id.) He handles stress by drinking beer and getting mad at her and their children. (Id. at 123.) He has difficulty finishing tasks. (Id. at 124.)

Plaintiff also completed a Disability Report. (Id. at 144-54.) He listed his height as 5 feet 8 inches tall and his weight as 170 pounds. (Id. at 144.) His ability to work is limited by pain, stress, a hip replacement, depression, and knee and back problems. (Id. at 145.) These impairments first bothered him on December 23, 2005, and prevented him from working that same day. (Id.) His current medications include ibuprofen and Percocet, prescribed by Dr. Mitchell Rotman for pain. (Id. at 151.) The ibuprofen upsets his stomach; the Percocet has no side effects. (Id.) He graduated from high school in 1985.[3] (Id.)

After the initial denial of his applications, Plaintiff completed a Disability Report – Appeal form. (Id. at 157-62.) Since completing the initial report, he had not seen any health care providers for any impairment, physical or mental, that limited his ability to work. (Id. at 158.) His current medications included aspirin and ibuprofen. (Id. at 159.) Neither had any side effects. (Id.)

On a Work History Report, Plaintiff listed jobs as an "asphalt laborer" from May 1992 to December 2005. (Id. at 126.) From May 1991 to May 1992 he had worked as a dishwasher. (Id.) From December 1990 to May 1991, he had worked as a fabricator in a metal shop. (Id.)

---

[3]Plaintiff was born June 5, 1966. (Id. at 154.)

The records before the ALJ of Plaintiff's medical treatment begin in 1988 and are summarized below in chronological order.

Plaintiff was treated at The University Hospital from August 12 to August 20, 1988, after jumping from a twelve-foot wall when intoxicated and landing on his back and buttocks. (Id. at 240-48.) X-rays revealed a compression fracture of L1. (Id. at 241.) Plaintiff was placed in a hyperextension cast. (Id. at 241-42.)

Plaintiff went to the emergency room at St. Francis Medical Center in August 1995 after receiving second-degree burns to small areas of his left forearm when he fell against a lit Coleman burner lantern. (Id. at 229-36.) He was treated and released with instructions on wound care. (Id.)

He returned to the emergency room three months later with complaints of pain in his heart and shakiness. (Id. at 219-28.) He had drunk a lot the day before. (Id. at 220.) Tests, including an x-ray and echocardiogram, showed no acute cardiopulmonary disease. (Id. at 223-28.)

Plaintiff went to the emergency room at St. John's Mercy Hospital (St. John's) on January 21, 2004, when he felt that his right knee might be dislocated. (Id. at 209-16, 316-18.) Three x-rays of the knee were negative. (Id. at 215, 317, 318.) On examination, his knee was tender and a little bit swollen. (Id. at 210.) His range of motion was limited by pain, "but [was] reasonably well preserved." (Id.) The diagnosis was a strain. (Id. at 211.) He was to use crutches until a follow-up visit with an orthopedist, use a knee immobilizer, and take Naproxen and Vicodin as needed. (Id.)

Petitioner returned to the St. John's emergency room on January 13, 2006, with complaints of pain in both shoulders and both hands. (Id. at 258-60, 319-20.) He was unable to sleep. (Id. at 319.) The left arm seemed worse than the right. (Id.) He had decreased grip strength and was unable pick up a milk carton. (Id.) He had no symptoms in his lower extremities. (Id.) He had had the pain for months, but decided to come to the emergency room because he had no primary care doctor. (Id.) On examination, he had a lot of pain in the rotator cuff area of both shoulders and tenderness over both wrists. (Id.) He had good bilateral hand grips. (Id.) The diagnosis was bilateral rotator cuff strain and probable bilateral carpal tunnel syndrome. (Id. at 319.) He was discharged home with Mobic, a non-steriodal anti-inflammatory drug, Vicodin (a combination of acetaminophen and hydrocodone) for pain, and Trazodone to help him sleep. (Id. at 320.)

R. Evan Crandall, M.D., examined Plaintiff on February 14 and diagnosed him with "right and left carpal tunnel syndrome at significant levels." (Id. at 188-90, 264-66, 279-81.) Dr. Crandall was to perform surgery on both wrists. (Id. at 189.) He opined that Plaintiff's job at Available Asphalt & Paving Company was "hand intensive" and was the main cause of the syndrome. (Id. at 186, 277.)

On February 27, Plaintiff underwent a right carpal tunnel release. (Id. at 187, 278.)

Dr. Crandall removed the sutures from Plaintiff's right wrist on March 6. (Id. at 185, 276.) Plaintiff's hand was "healing well" and he was to participate in physical therapy two to three

times a week.  (<u>Id.</u> at 185, 262-63.)  He was to return in two weeks for a left carpal tunnel release.  (<u>Id.</u> at 185.)  This was performed on March 28.  (<u>Id.</u> at 184, 275.)

On April 4, after removing the sutures from Plaintiff's left wrist, Dr. Crandall released him to work light duty and anticipated releasing him to all activities with five weeks.  (<u>Id.</u> at 183, 255, 274.)  Two weeks later, Dr. Crandall released Plaintiff to return to work to one-handed duty with his right hand.  (<u>Id.</u> at 182, 254, 273.)  He noted that Plaintiff was making good progress in his physical therapy, had a full range of motion, and had relief of his numbness and tingling.  (<u>Id.</u> at 182.)

Dr. Crandall reported on May 9 that Plaintiff could "return to all activities without restrictions."  (<u>Id.</u> at 181, 272.)  Plaintiff's scars were well-healed; his range of motion and grip strength were excellent; his numbness and tingling had resolved.  (<u>Id.</u>)

On referral of his former employer's worker's compensation insurance carrier, Plaintiff consulted Mitchell B. Rotman, M.D., on May 15 about bilateral shoulder pain.  (<u>Id.</u> at 307-13.)  The pain had begun a few months before Christmas when he lifted heavy equipment at work.  (<u>Id.</u> at 307.)  He had gone to the emergency room, but had not seen a doctor since.  (<u>Id.</u>)  The pain was constant, worse at night, and worse on the left than on the right.  (<u>Id.</u>)  He was fired a few days after Christmas and had been fired and rehired again a few times since.  (<u>Id.</u>)  He was presently not working.  (<u>Id.</u>)

Plaintiff returned to the emergency room at St. John's on June 7 after hurting his shoulder when playing football with his children three days earlier.  (<u>Id.</u> at 321-24.)  The shoulder was swollen, bruised, and had a decreased range of motion.  (<u>Id.</u> at 321.)  He had a

full range of motion in his elbow and wrist and good grip strength.  (Id.)  The diagnosis was right acromioclavicular (AC) separation.  (Id. at 321, 323.)

Plaintiff was taken by ambulance back to the emergency room the next day after developing a headache and vomiting as a result of inhaling fumes emitted by snake repellant pellets he had spread in his basement.  (Id. at 325-26.)  The fire department's HAZMAT team cleaned out the basement and sent the hospital the material data sheet identifying the product and its primary ingredient, naphthalene.[4]  (Id. at 326.)  Plaintiff was released home with Tylenol.  (Id.)

The following day, June 9, he was seen by Dean A. Lusardi, M.D., for his shoulder pain.  (Id. at 332.)  His right shoulder was still swollen and tender.  (Id.)  He was to wear a sling, work on a gentle pendulum range of motion, and return in three weeks.  (Id.)  Plaintiff reported continuing pain when he returned on June 30.  (Id.)  He had a full range of motion in the shoulder, but was tender over the AC joint "with obvious palpable instability in that area."  (Id.)  Dr. Lusardi recommended a magnetic resonance imaging (MRI) scan, but Plaintiff deferred because he had no insurance.  (Id.)  Dr. Lusardi then recommended that Plaintiff work on his range of motion and they reevaluate in three to six months.  (Id.)

Eight days earlier, Plaintiff had had an MRI scan of his left shoulder.  (Id. at 197-98.) The scan revealed a subchondral bone cyst at the supraspinatus insertion and a focal area of

---

[4]Naphthalene is "[a] carcinogenic and toxic hydrocarbon obtained from coal tar; used for many syntheses in industry and in some moth repellents . . . ."  mediLexicon, http://www.medilexicon.com/ medicaldictionary.php (last visited August 10, 2010).

abnormality in the supraspinatus insertion consistent with at least a partial undersurface tear. (<u>Id.</u> at 198.)

In August, Plaintiff was diagnosed with a rotator cuff tear in his right shoulder based on the results of the MRI scan. (<u>Id.</u> at 200-01.)

Dr. Rotman performed a rotator cuff repair on Plaintiff's left shoulder on August 16.[5] (<u>Id.</u> at 206, 297, 304.) Two weeks later, Plaintiff continued to complain of pain on his right side. (<u>Id.</u> at 289.) It was noted that the MRI had revealed "a very small tear." (<u>Id.</u>) On the left side, Plaintiff was "doing fairly well." (<u>Id.</u>) He already had about 40 degrees of external rotation and had smooth motion. (<u>Id.</u>) He was to continue wearing a sling for another four weeks. (<u>Id.</u>) He was released to return to work with the condition that he wear the sling and be limited in the use of his left upper extremity. (<u>Id.</u> at 205, 298.) Following a post-operative visit on September 26, Plaintiff was to begin physical therapy two to three times a week for six weeks. (<u>Id.</u> at 203-04, 290, 299.) On his left side, he had a range of motion of 50 degrees of active abduction, 100 degrees of passive abduction, and 40 degrees of external rotation. (<u>Id.</u> at 290.) A right rotator cuff repair was to be performed in three to four weeks. (<u>Id.</u> at 203.)

Dr. Rotman did perform that repair on October 18. (<u>Id.</u> at 192-94, 300, 305-06.) He released Plaintiff to return to work in five days. (<u>Id.</u> at 192.) Plaintiff was to wear a sling

---

[5]The year reads "2003." This is clearly an error as the records of Plaintiff's post-operative visits are all dated "2006."

while working.  (Id.)  He was also to participate in physical therapy two to three times a week for six weeks.  (Id. at 193.)

When Plaintiff saw Dr. Rotman on November 2 he was described as "doing very well." (Id. at 291.)  He as a bit stiff on his right side and had 20 to 30 degrees of external rotation and 90 degrees of passive abduction.  (Id.)  Dr. Rotman noted that Plaintiff had also initially been stiff on his left side after the repair surgery.  (Id.)  Plaintiff was to continue with aggressive physical therapy and return in four weeks.  (Id.)  Plaintiff did, reporting some pain in the right shoulder.  (Id. at 292.)  He had a "nearly full passive range of motion" in that shoulder.  (Id.)  Although he complained, he was "actually doing quite well on the right." (Id.)  He could lift up to five pounds on the right as long as he lifted from his elbow down and not from his shoulder.  (Id.)

Plaintiff saw Dr. Rotman again on January 11, 2007.  (Id. at 293, 303.)  Plaintiff thought he had hit a plateau, was still having trouble sleeping at night, and was concerned about his right AC joint because it was a little bit more prominent than the left.  (Id. at 293.) He had an excellent range of motion in his right shoulder and some slight weakness.  (Id.) He was released to return to work without restrictions in three weeks.  (Id. at 293, 303.)  In the interim, he was to remain on light duty.  (Id. at 303.)  His permanent partial disability at the right shoulder was 10%.  (Id. at 293.)  On March 30, Dr. Rotman wrote the claims representative that Plaintiff's permanent partial disability at his left shoulder was 8%.  (Id. at 295.)

On February 26, Plaintiff went to the St. John's emergency room for treatment of symptoms he had had since being assaulted two days earlier. (Id. at 327-30.) He complained of a persistent headache and neck discomfort. (Id. at 327.) A computed tomography (CT) scan of his head and neck revealed no fractures or abnormalities. (Id. at 328-30.) Plaintiff was released home with instructions to rest and follow-up with his primary care physician. (Id. at 328.)

The next medical record is from 2008 when Plaintiff went to the emergency room at St. John's on May 2 for his right shoulder pain. (Id. at 351-65.) He had settled his worker's compensation case[6] and needed a referral to an orthopedist. (Id. at 352, 353.) He was getting Vicodin "off the streets" for his chronic pain. (Id. at 353, 357.) He was discharged with prescriptions for Vicodin and Naprosyn and with instructions to follow-up with his orthopedist and to rest. (Id. at 352.)

Two weeks later, Plaintiff consulted Coles E. L'Hommedieu, M.D., about his right shoulder pain and right upper extremity numbness. (Id. at 375-76, 384.) He reported that his shoulder had never recovered from the effects of a fall in 2005 and he has had persistent pain with overhead activities. (Id. at 375.) Modifying his activities gave him no relief. (Id.) He was currently taking Vicodin and Naproxen and had no known drug allergies. (Id.) He smoked infrequently and drank beer occasionally, but not daily. (Id.) On examination, Plaintiff had no significant pain with forward flexion or circumduction/extension of his

---

[6]Plaintiff's worker's compensation claim arising from an accident on December 23, 2005, was settled in June 2007 for $69,000, 25% of which was attorney's fees. (Id. at 411.)

cervical spine.  (Id.)  He had no low back pain with palpation of the spine and paraspinous musculature.  (Id.)  He had diffuse tenderness in the subacromial region of his right shoulder and around the shoulder musculature.  (Id.)  His muscles on both sides were symmetric.  (Id.)  Forward flexion of his wrists caused pain.  (Id.)  He had no gross instability in either shoulder, but did have some limitations on passive external rotation and abduction.  (Id.)  He had pain with internal rotation, but minimal limits with regard to rotation, particularly on his right side.  (Id.)  He walked without a significant antalgic gait.  (Id. at 376.)  The plan was for Plaintiff to have an electromyograph (EMG)/nerve conduction study (NCV) and right shoulder ultrasound.  (Id.)  The ultrasound was performed on June 3; an EMG was performed on June 9.  (Id. at 385-86, 401.)

Plaintiff returned to Dr. L'Hommedieu on June 12, reporting that there had been no improvement in his persistent pain.  (Id. at 377.)  Dr. L'Hommedieu noted that the EMG was negative and the ultrasound indicated a recurrent rotator cuff tear of approximately 2.0 centimeters.  (Id.)  There was no atrophy or muscle change indicative of a chronic condition.  (Id.)  He discussed with Plaintiff a revision rotator cuff repair and limited him currently to sitting work with no lifting with his right arm.  (Id. at 377, 387.)  Plaintiff agreed to proceed with the repair, which was performed without complications two weeks later.  (Id. at 377-79.)  Two days later, Dr. L'Hommedieu gave Plaintiff a prescription for Percocet, no refills, and Flexeril, no refills.  (Id. at 380, 393.)

Plaintiff's prescription for Percocet was refilled, however, when he saw Dr. L'Hommedieu on June 30.[7] (Id. at 381.) Plaintiff reported having increasing pain but doing well otherwise. (Id.) He was to start on physical therapy and return in one month. (Id. at 381, 389-90.)

At his next, July visit, Plaintiff informed Dr. L'Hommedieu that he had been unable to afford physical therapy. (Id. at 382.) Indeed, he had had to sell his boat. (Id.) Plus, his wife had to work double shifts and could not drive him. (Id.) He reported that his pain was improving, although he still had pain when he awoke and was avoiding too much activity. (Id.) On examination, he had some pain with abduction. (Id.) Passive abduction was approximately 120 degrees; forward flexion was approximately 130 degrees; external rotation was approximately 50 degrees; and internal rotation was to the waist level. (Id.) Plaintiff was to begin a home active range of motion and strengthening program in one motion. (Id. at 382, 391.) He was prescribed Vicodin. (Id. at 382.)

Plaintiff's range of motion was described by Dr. L'Hommedieu in August as being "really quite good with mild limitations to abduction and external rotation." (Id. at 383.) Plaintiff had some diffuse tenderness and minimal impingement. (Id.) Dr. L'Hommedieu gave Plaintiff a corticosteroid injection to try to increase his pain tolerance and instructed him to continue with physical therapy. (Id.) Vicodin was prescribed. (Id.) There was no set return visit. (Id.)

---

[7]The prescription was refilled again on July 10. (Id. at 394.)

The physical therapist reported to Dr. L'Hommedieu on August 28 that Plaintiff had attended only one of two scheduled appointments – she believed his absence was because he was self-pay – and was discharged. (<u>Id.</u> at 395.) At the appointment he did keep, he described his pain as averaging a seven on a ten-point scale and at worst as a ten. (<u>Id.</u>)

Plaintiff returned to Dr. L'Hommedieu on September 19, reporting that he was doing "quite a bit better" overall. (<u>Id.</u> at 396.) He had occasional popping in his right shoulder with activities but no pain. (<u>Id.</u>) He was having more left shoulder pain. (<u>Id.</u>) He had some discomfort with passive circumduction of the left shoulder, but had passive full abduction and full flexion of the right shoulder. (<u>Id.</u>) Plaintiff was given a prescription for Darvocet to relieve his morning pain and his pain with vigorous activities. (<u>Id.</u>) He was to increase his activity as tolerated. (<u>Id.</u>) He was released to full activity on the right side and was to return as needed. (<u>Id.</u>)

Plaintiff did return the next month with complaints of left shoulder pain. (<u>Id.</u> at 397-98.) An x-ray showed no evidence of a fracture. (<u>Id.</u>) He was given a corticosteroid injection and instructed to "engage in physical therapy aggressively." (<u>Id.</u> at 397.) In December, Plaintiff informed Dr. L'Hommedieu that the injection had only helped for approximately two and one-half weeks. (<u>Id.</u> at 399.) On examination, he had pain with a passive range of motion and positive impingement findings. (<u>Id.</u>) He was to have a left shoulder ultrasound. (<u>Id.</u> at 399-400.)

As noted above, also before the ALJ were reports of independent medical examinations performed pursuant to Plaintiff's worker's compensation claim and his application for Missouri Medicaid benefits.

At the request of the claims representative for Plaintiff's former employer's worker's compensation insurance carrier, Dr. Rotman performed an independent medical examination of Plaintiff in May 2006. (<u>Id.</u> at 249-52, 284-86.) Plaintiff reported that he had bilateral shoulder pain, worse on the left, with popping and grinding, could not lift a gallon of milk, and could not sleep at night. (<u>Id.</u> at 249, 250.) He had been fired on December 23, 2005, from his asphalt job. (<u>Id.</u> at 249.) "Apparently, there was a claim filed after his job was terminated due to constant irresponsibility and the lack of good judgment." (<u>Id.</u> at 250.) His recent treatment for carpal tunnel syndrome had helped significantly. (<u>Id.</u> at 249.) He no longer had any problems with numbness or tingling. (<u>Id.</u>) He smoked one pack of cigarettes a week. (<u>Id.</u> at 250.) His hobbies included fishing, camping, boating, and hunting. (<u>Id.</u>)

On examination, Plaintiff had no pain with motion of his neck and no atrophy or spasms about his shoulders. (<u>Id.</u> at 251.) He had pain with rotation of his left shoulder. (<u>Id.</u>) After further testing, Dr. Rotman concluded as follows.

> I have no etiology for his present complaints of shoulder pain. He doesn't have any discomfort in any specific region that would be typical of any particular shoulder condition. His pain is ill-defined. His pain is pretty symmetric, which is quite odd, though it is greater on the left than on the right. It doesn't seem to be related to his neck and relationship to any particular problem in his shoulder as I've stated is unclear. . . . Presently, I would not place him on any restrictions. It is odd that his pain would not be relieved, considering he hasn't worked in four months. . . .

(<u>Id.</u> at 251-52.)

At the request of his worker's compensation counsel, Plaintiff underwent an independent medical examination in July 2006 by David T. Volarich, D.O. (Id. at 169-79.) Plaintiff reported that he had had pain in both shoulders and numbness and tingling in both hands before an injury on December 23, 2005. (Id. at 170.) He had undergone bilateral carpal tunnel releases and was being treated for left shoulder impingement and a possible rotator cuff injury. (Id.) He had right shoulder pain consistent with a diagnosis of rotator cuff tendonitis and impingement. (Id.) He had recently injured his right shoulder on June 4, 2006, when he was tackled playing football with his children. (Id. at 170, 171.) The carpal tunnel release surgeries had improved the numbness and tingling, but he continued to have occasional tingling in the small finger of both hands. (Id. at 172.) His dexterity had improved; his grip strength was worse. (Id.) He had popping and grinding in both shoulders, worse on the left than on the right, and had pain when lifting above chest level. (Id.) He also had pain when throwing or bowling. (Id.) He had difficulty with any movement of his shoulders. (Id.) The discomfort in his shoulders and hands was worse when the weather was damp, cold, and rainy. (Id.) He did not have any problems with his shoulders, forearms, wrists, or hands before December 23, 2005. (Id.) He had had some problems with his right shoulder before the June 4 injury, although until then his left shoulder hurt worse than the right. (Id.) The pain in both shoulders was now equal. (Id.)

Plaintiff informed Dr. Volarich that he had had a surgical repair to his left hip and leg after he was injured in an 1984 motorcycle accident. (Id. at 173.) His left hip and leg were stiff and painful and made it difficult for him to squat, stoop, crawl, and kneel. (Id.)

Although the injury had "slow[ed] him down," he had returned to unrestricted duty afterwards. (Id.) In August 1988, he had injured his back. (Id.) In 1994, he had surgery after injuring his left knee. (Id.) As with his left hip and leg, the injuries to his back and left knee had slowed him down but had not prevented his return to unrestricted duty. (Id.) His current medications included ibuprofen and Vicodin. (Id.) Percocet caused vomiting. (Id.)

Dr. Volarich noted that Plaintiff disagreed with the reports in his medical records that he smoked one pack of cigarettes a day. (Id. at 174.) Plaintiff clarified that he smoked one pack per week and had done so for twenty-five years. (Id.) He also smoked two to three packs of cigars a year. (Id.) He drank a case of beer each week. (Id.)

On examination, Plaintiff had a restricted range of motion in his wrists and decreased grip strength. (Id. at 174-75.) Dr. Volarich concluded that Plaintiff had a 35% permanent partial disability of his right and left upper extremities at the wrists. (Id. at 177.) He did not assess the percentage of disability Plaintiff had in either shoulder because Plaintiff had not yet achieved maximum medical improvement. (Id.) He concluded that Plaintiff was "able to perform most activities for self-care" and could work with certain limitations. (Id. at 178.) Specifically, Plaintiff should minimize repetitive gripping, pinching, squeezing, pushing, pulling, twisting, and rotating motions. (Id.) He should "avoid using his hands in an awkward or blind fashion" and avoid impact and trauma to his hands. (Id.) He should not handle any weight greater than five pounds with one extremity alone. (Id.)

Dr. Crandall also wrote the claims representative. (Id. at 270-71.) In his report of October 17, 2006, he stated that Plaintiff had a full range of motion in his fingers, wrist,

elbow, and shoulder in his upper right and left extremities. (Id.) Plaintiff had reached maximum medical improvement in his right and upper extremities at the wrist level and had a permanent partial impairment of 7% in each. (Id. at 271.) He could work without any restrictions as far as his hands were concerned. (Id.)

Stanley London, M.D., examined Plaintiff in January 2009 at the request of the Missouri Family Support Division pursuant to Plaintiff's request for Medicaid benefits. (Id. at 403-09.) Plaintiff complained of problems with his left shoulder, right knee, and left hip. (Id. at 403.) Specifically, he had continuous pain, popping, and limited motion in his left shoulder. (Id.) He had had pain in his left elbow for the past six to seven months on flexion, extension, and turning. (Id.) His right knee would become dislocated and would have to be pushed back in. (Id.) He had weakness and pain in his left hip. (Id.) His pain was described as "sharp, dull, cramping, and aching." (Id.) He could walk okay, stand for twenty minutes, and sit "for a while [sic]." (Id. at 404.) He did not use a cane or crutch. (Id.) He walked reasonably normally, could heel and toe walk, and could hop. (Id.) He had trouble squatting. (Id.) An x-ray of the right knee showed advanced degenerative changes throughout the joint. (Id. at 406.) Plaintiff had a grip strength of 5/5 in both hands. (Id. at 407.) His upper extremity strength on his left was 4/5 and on his right was 5/5, with 5 being normal. (Id.) Dr. London opined that Plaintiff had a "[p]robable continued cuff tear in [the] left shoulder" and possible degenerative joint disease in his left hip. (Id. at 404.)

As part of the examination, Dr. London completed a two-page Division form, a Medical Report Including Physician's Certification/Disability Evaluation. (Id. at 408-09.)

He did not complete the section asking for a brief clinical history and the patient's chief complaints; the required section asking for statistics such as weight, height, and blood pressure; the section asking for a description of the disease or injury to bones, joints, and extremities and any resulting limitation on motion, such as the ability to walk, stand, or grasp; or the section asking for the primary and secondary diagnoses and for a summary of the findings with an emphasis on functional capacity. (Id.) Indeed, the only portion of the form completed by Dr. London, other than his signature and date, is a check mark in the section titled "Determination of Incapacity," indicating that Plaintiff had a disability that precluded him from working. (Id.)

Two evaluations by non-examining consultants were before the ALJ.

In June 2007, Stanley Hutson, Ph.D., completed a Psychiatric Review Technique form for Plaintiff. (Id. at 333-43.) He was assessed as having no medically determinable mental impairment. (Id. at 333, 343.) In explaining this conclusion, Dr. Hutson noted that Plaintiff had never been treated for depression or stress and was not on any medication for depression. (Id. at 343.) Plaintiff had not mentioned any mental limitations when interviewed in March 2007. (Id.)

That same month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by a non-examining consultant. (Id. at 344-50.) The primary diagnosis was status post bilateral rotator cuff repair and right AC decompression; the secondary diagnosis was status post bilateral carpal tunnel release; and other alleged impairments included a history of an L1 compression fracture and alcohol abuse. (Id. at 344.) These impairments resulted

in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 237.) His ability to push or pull was limited in his upper extremities. (Id. at 345.) He had no postural, visual, communicative, or environmental limitations. (Id. at 346-48.) He had one manipulative limitation – he was limited in his ability to reach in all directions. (Id. at 347.)

Additionally, Plaintiff submitted to the ALJ an April 2008 letter from Charles Gerding, the president of Gerding Enterprise, Inc. (GEI), five letters from employees there, and a June 2008 from the plant manager at GEI. (Id. at 365-73.) The letter from Mr. Gerding indicates that Plaintiff was hired on December 27, 2007; he had limited work capacity due to his injured shoulder; and he complained about shoulder pain. (Id. at 365.) The correspondence from other employees indicated that Plaintiff had trouble with the lifting requirements of the job due to his shoulder pain. (Id. at 367-71.) The letter from the plant manager reports that Plaintiff had been discharged "because of problems with his attitude and of overall poor quality work." (Id. at 372.)

### The ALJ's Decision

After outlining the Commissioner's five-step sequential evaluation process, the ALJ found at step one that Plaintiff met the insured status requirements through March 31, 2010, and, at step two, that he had not engaged in substantial gainful activity since his amended alleged onset date of June 6, 2008. (Id. at 15.) The ALJ next found at step three that Plaintiff had severe impairments of previous right knee surgery, carpal tunnel release surgeries in each

wrist, a history of bilateral rotator cuff surgeries, left elbow epicondylitis, and a previous compression fracture of his spine.  (Id.)  He did not have any severe mental impairment, including depression.  (Id. at 16.)  At step three, the ALJ concluded that Plaintiff's severe impairments, singly or in combination, did not meet, or medically equal, an impairment of listing-level severity.  (Id.)

The ALJ next addressed the question at step four of Plaintiff's residual functional capacity (RFC).  She concluded that he had the RFC to lift ten pounds, stand or walk two hours out of an eight-hour work day, and sit for six hours in an eight-hour work day.  (Id.)  He could not lift his right arm above shoulder level, but could use it to support lifting with his left arm, and, because of his pain, was restricted to work that required no more than simple one or two step instructions.  (Id.)

In support of her RFC assessment, the ALJ found that Plaintiff's claim of disabling right knee pain was unavailing given the negative x-rays in January 2004 and January 2006, the lack of any alleged ongoing right knee symptoms between January 2006 and January 2009, and his reported good range of motion in the knee in January 2009, although Dr. London noted that Plaintiff had advanced degenerative changes of the knee joint.  (Id. at 17.)  Plaintiff's claim of disabling shoulder impairments was unavailing given the lack in May 2006 of any pain, atrophy, swelling, left shoulder spasm, and appearance of pain.  (Id.)  The pain described by Plaintiff was ill-defined, and Dr. Rotman noted that Plaintiff had no etiology for the allegations of shoulder pain.  (Id.)  A June 2006 MRI of Plaintiff's left shoulder indicated an undersurface tear, but he had a full range of motion in his right shoulder with tenderness

and pain over the AC joint. (Id. at 17-18.) The ALJ outlined the other objective findings on Plaintiff's shoulder, including the discrepancy between those findings and his complaints and the reference to his non-compliance with medication and physical therapy. (Id. at 18.) The medical records also did not support Plaintiff's claim of any long-term limitations caused by his bilateral carpal tunnel syndrome. (Id. at 19.) Additionally, insofar as several of the limitations found by Dr. Volarich, including a limited ability to grip, push, pull, and twist were inconsistent with those found by Dr. Crandall, those limitations were unpersuasive. (Id.) The observations of Dr. London did not support Plaintiff's testimony. (Id. at 19-20.) The ALJ further noted that Plaintiff had improved after his multiple surgeries, no treating physician had ever imposed any long-term, significant limitation on Plaintiff, Plaintiff was not always compliant with his medications, and he sometimes obtained Vicodin "'from the street'" and not from a physician and sometimes mixed alcohol with prescription medication. (Id. at 20.)

With his RFC, Plaintiff was unable to perform any past relevant work. (Id.)

Consequently, the ALJ addressed the question at step five of whether there was other work existing in significant numbers in the national economy that Plaintiff could do given his age, education, work experience, and ability to communicate in English. (Id.) The ALJ found that regardless of whether Plaintiff had transferable work skills, he was not, according to the

Medical-Vocational Guidelines, disabled, but could perform the full range of sedentary work.[8]
(Id. at 20-21.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's]

_____

[8]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without

obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity."

20 C.F.R. § 220.130(a). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; <u>accord</u> **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred (1) when assessing his RFC and (2) by not calling a vocational expert (VE).[9]

As noted above, Plaintiff has the burden at step four of establishing his RFC. <u>See</u> **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004). On the other hand, the ALJ has the responsibility of assessing that RFC based on all the relevant evidence, including "at least some supporting [medical] evidence from a professional." **Id.** at 738.

Plaintiff argues that a proper assessment of his RFC would have resulted in a finding that he satisfies Listing 1.02. Listing 1.02 reads as follows.

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.02. An inability to ambulate effectively is defined, in relevant part, as follows.

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's

---

[9]The Court notes that, although the Commissioner argues that the ALJ's adverse credibility determination is supported by substantial evidence, Plaintiff does challenge that determination.

ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.00B(2)(b)(1).  Examples of an inability to ambulate effectively include an inability to walk without two crutches or canes, to use standard public transportation, or to climb a few steps.  Id. § 100B(2)(b)(2).  Fine and gross movements are defined as follows.

Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. pt. 404, subpt. P, appx. 1, § 1.00B(2)(c).

Plaintiff cites problems with his right knee to satisfy the criteria of  Listing 1.02(A) and problems with his shoulders and his carpal tunnel surgeries to satisfy the criteria of Listing 1.02(B).  As evidence of these impairments, he relies on the report of Dr. London.

Dr. London examined Plaintiff in January 2009, seven months after Plaintiff's alleged disability onset date.  Plaintiff complained of problems with his right knee becoming dislocated.  He did not use any assistive device, however, and was able to walk normally,

walk heel and toe, and hop.  He stated he could walk okay.  An x-ray of the right knee showed advanced degenerative changes, however, those changes did not affect his ability to walk.

Plaintiff also cites his carpal tunnel release surgeries and his shoulder problems as indicators of an inability to effectively perform fine and gross movements.  When examined by Dr. London he had full grip strength in both hands and fair upper extremity strength.  He had been released to return to work by the physicians who had performed the carpal tunnel release surgeries and the rotator cuff tear repairs.  Moreover, the use of the sling and the limitation on using one arm only – restrictions cited by Plaintiff as evidence of his inability to use his upper extremities – were short-term restrictions placed on him after his surgeries and were followed by unrestricted releases to return to work.

As noted above, the ALJ found that Plaintiff had the RFC to lift ten pounds, stand or walk two hours out of an eight-hour work day, and sit for six hours in an eight-hour work day. He could not lift his right arm above shoulder level, could use that arm to support lifting with his left arm, and was restricted to work that required no more than simple one or two step instructions.  The only evidence that Plaintiff cites as undermining this RFC is the report of Dr. London.  There is nothing in that report, however, that contravenes the ALJ's conclusions as to his RFC.

Plaintiff next argues that the ALJ also erred by not calling a VE because he has significant non-exertional impairments that preclude the use of the Medical-Vocational Guidelines, i.e., the inability to lift his arm above shoulder level and to follow more than two-step instructions.

Applying those Guidelines, the ALJ found that Plaintiff – less than 50 years of age – could perform the full range of sedentary work. "The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools." Social Security Ruling 96-9p, 1996 WL 374185, *3 (Soc. Sec .Admin. July 2, 1996). "Sitting would generally total about 6 hours of an 8-hour workday." Id. Thus, the ALJ's finding that Plaintiff could lift no more than 10 pounds at a time and sit for a total of six hours in an eight-hour workday is consistent with the definition of sedentary work.

"Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, manipulation, and *understanding, remembering, and carrying out simple instructions*." Id. (emphasis added). "[I]n order for a rule to direct a conclusion of 'not disabled,' an individual must also have no impairment that restricts the nonexertional capabilities to a level below those needed to perform unskilled work, in this case, at the sedentary level." Id. Thus, the ALJ's limitation of Plaintiff being unable to follow more than simple instructions is also consistent with the definition of unskilled work.

The remaining limitation found by the ALJ – an inability of Plaintiff to lift his right arm above shoulder level unless using that arm to support lifting with his left arm – is an exertional limitation. See Social Security Ruling 85-15, 1995 WL 56857, *7 (Soc. Sec. Admin. 1985). A significant limitation on reaching might preclude use of the Guidelines. Id.

In **Falcon-Cartagena v. Commissioner of Social Security**, 21 Fed. Appx. 11 (1st Cir. 2001) (per curiam), the court affirmed the decision of the ALJ applying the Guidelines after

finding that the claimant was unable to perform only tasks requiring *constant* overhead reaching with his left arm and that this restriction had only a marginal effect on the relevant occupational base. **Id.** at 14. On the other hand, an ALJ's reliance on the Guidelines in **Mondragon v. Apfel**, 3 Fed. Appx. 912 (10th Cir. 2001), was reversed and remanded for vocational expert testimony when the claimant was unable to perform tasks requiring *regular* overhead reading. **Id.** at 917. Accord **Candelaria v. Barnhart**, 195 Fed. Appx. 2, 3-4 (1st Cir. 2006).

Thus, an RFC that precluded constant overhead reaching did not bar the use of the Guidelines, but an RFC that precluded regular overhead reaching did. These holdings capture the concern in Social Security Ruling 85-15 that "[v]arying degrees of limitations [on reaching] would have different effects, and the assistance of a [vocational expert] may be needed to determine the effects of the limitations." Social Security Ruling 85-15, 1995 WL 56857 at *7. Reflecting this concern, the assistance of a VE was called upon in **Webb v. Commissioner of Social Security**, 368 F.3d 629, 630-31 (6th Cir. 2004) (a vocational expert testified that a claimant with an RFC similar to that of Plaintiff's, including no overhead reaching with the right arm, could not perform the full range of sedentary work, but could perform some jobs existing in the national and state economies), and in **Koonce v. Apfel**, 1999 WL 7864 (4th Cir. 1999) (affirming denial of benefits to claimant who could do no overhead reaching and could only use her left arm as an assistive device in case in which those limitations had been presented to VE in hypothetical question).

A VE was not called in the instant case. Nor is there any finding by the ALJ of how significant a limitation Plaintiff's inability to reach above shoulder level with his right arm is. Indeed, there is no finding whether Plaintiff's right arm is the dominant arm.

For the foregoing reasons, the Court finds the ALJ erred by not eliciting testimony from a vocational expert about the significance of Plaintiff's reaching limitation on the range of sedentary work he can perform.

### Conclusion

The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence on the record as a whole. The ALJ erred, however, by relying on the Medical-Vocational Guidelines. Therefore, this case is reversed and remanded for the limited purpose of obtaining vocational expert testimony about the occupational consequences of Plaintiff's nonexertional reaching limitations.

SO ORDERED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of August, 2010.